IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

TAMARA J. CANTWELL,            )
                               )
            Plaintiff,         )
                               )
      v.                       )     Case No.
                               )     06-4181-CV-C-REL-SSA
MICHAEL J. ASTRUE, Commissioner)
of Social Security,            )
                               )
            Defendant.         )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Tamara Cantwell seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  I find that the substantial
evidence in the record as a whole supports the ALJ's decision.
Therefore, plaintiff's motion for summary judgment will be denied
and the decision of the Commissioner will be affirmed.

*I.   BACKGROUND*

On February 17, 2003, plaintiff applied for disability
benefits alleging that she had been disabled since January 1,
2003.  Plaintiff's disability stems from fibromyalgia.
Plaintiff's application was denied initially and upon reconsider-
ation.  On August 10, 2005, a hearing was held before an
Administrative Law Judge.  On September 1, 2005, the ALJ found
that plaintiff was not under a "disability" as defined in the
Act.  On June 14, 2006, the Appeals Council denied plaintiff's

request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as

2

adequate to support a conclusion." <u>Richardson v. Perales</u>, 402
U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991). However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts. "[A]n
administrative decision is not subject to reversal merely because
substantial evidence would have supported an opposite decision."
<u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of
proving she is unable to return to past relevant work by reason
of a medically-determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the
plaintiff establishes that she is unable to return to past
relevant work because of the disability, the burden of persuasion
shifts to the Commissioner to establish that there is some other
type of substantial gainful activity in the national economy that
the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857
(8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo.
2000).

The Social Security Administration has promulgated detailed
regulations setting out a sequential evaluation process to

3

determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, *et seq.*  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.   Is the claimant performing substantial gainful activity?

>    Yes = not disabled.
>    No = go to next step.

2.   Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

>    No = not disabled.
>    Yes = go to next step.

3.   Does the impairment meet or equal a listed impairment in Appendix 1?

>    Yes = disabled.
>    No = go to next step.

4.   Does the impairment prevent the claimant from doing past relevant work?

>    No = not disabled.
>    Yes =  go to next step where burden shifts to Commissioner.

5.   Does the impairment prevent the claimant from doing any other work?

>    Yes = disabled.
>    No = not disabled.

## IV.  *THE RECORD*

The record consists of plaintiff's testimony and documentary evidence admitted at the hearing.

4

*A.    ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1984 through 2005:

| Year | Earnings |
|------|----------|
| 1984 | $    783.66 |
| 1985 |      961.50 |
| 1986 |        0.00 |
| 1987 |    2,826.28 |
| 1988 |    2,559.80 |
| 1989 |    6,379.38 |
| 1990 |    9,414.00 |
| 1991 |   11,001.15 |
| 1992 |   10,970.49 |
| 1993 |    5,263.36 |
| 1994 |    6,166.01 |
| 1995 |    2,203.93 |
| 1996 |        0.00 |
| 1997 |        0.00 |
| 1998 |        0.00 |
| 1999 |    7,795.46 |
| 2000 |   15,946.76 |
| 2001 |   13,586.35 |
| 2002 |    7,965.19 |
| 2003 |    4,425.00 |
| 2004 |        0.00 |
| 2005 |        0.00 |

(Tr. at 49, 58).

**Work Activity Report**

On February 16, 2004, plaintiff completed a work activity report (Tr. at 56-61).  Plaintiff reported that she worked at the Eldon R-1 School District as a teacher's aide from August 25, 2001, through August 27, 2003 (Tr. at 57).  She began at $6.45

5

per hour and ended at $6.85 per hour, and she worked 37.5 hours per week average (Tr. at 57). Plaintiff reported that she missed a lot of work from January 2003 to May 2003 (Tr. at 57). Plaintiff reported having earned $865.00 during each month From January 2003 through May 2003, and then $100.00 in August 2003 (Tr. at 58).

The form asks whether plaintiff got special help on the job for her medical conditions, and she checked, "yes" (Tr. at 58). However, the form says to check all of the boxes that were true for her, and plaintiff did not check the box which states "I worked irregular hours or took frequent rest periods." (Tr. at 58). Instead she wrote, "The third year I was assigned to a student who was in a wheelchair and had to be diapered and I asked to be switched to a student who would not require that kind of assistance, because of my disability I could not do that. I was given another student before classes even began. Then I still had to resign after only 3 days." (Tr. at 59).

**Claimant Questionnaire**

In a Claimant Questionnaire completed on February 25, 2004, plaintiff reported that she has her checking account set up on Microsoft money and she uses that program to pay her bills and balance her checkbook (Tr. at 86). Plaintiff reported that she is able to do laundry, do dishes, make her bed, change sheets,

6

iron, bank, and go to the post office (Tr. at 87).

Plaintiff reported that she reads, watches television, and plays board games (Tr. at 88). She tries to exercise daily for about ten minutes (Tr. at 88). Plaintiff reported that she cannot sit in the same position for a full television show or movie, rather she has to change positions, stand up, or lie down (Tr. at 88). Plaintiff drives to her daughter's school daily, and she drives to the store once a week (Tr. at 88). Once or twice a year she goes to Branson, Kansas City, or St. Louis with her family, and her husband drives (Tr. at 88).

**B.    SUMMARY OF MEDICAL RECORDS**

On May 31, 2002, plaintiff saw Thomas Folz, M.D., at the request of Gary Baskett, D.O. (Tr. at 156-157). Plaintiff's chief complaint was pain and sleep problems. On exam plaintiff had normal affect, no soft tissue or joint swelling, normal spinal and joint alignment, normal joint stability. Plaintiff had normal range of motion, normal deep tendon reflexes, normal sensation, essentially normal motor strength. Plaintiff had 13 of 18 fibromyalgia tender points. Dr. Folz prescribed 10 mg of Nortriptlyine (antidepressant) at bedtime, advised plaintiff on aerobic conditioning, and advised her to establish a very regular sleep pattern.

7

On June 24, 2002, plaintiff saw Thomas Folz, M.D., for a follow up on fibromyalgia (Tr. at 154). "She overall feels improved. Part of the improvement may be that she has less stress since she is on summer vacation from school. No side effects have been noticed to the medication." On exam, palpation revealed less tenderness in general, still had tender points mostly in the upper back region. She had normal range of motion. She was assessed with fibromyalgia - symptomatically improved. Dr. Folz told plaintiff to continue taking 10 mg of Nortriptyline (antidepressant) every night, and if her condition remained stable through October, he would consider taking her off nortriptyline at that time.

On January 10, 2003, at 10:40 a.m., plaintiff was seen by Gary Baskett, D.O., at the Eldon Family Health Center (Tr. at 98). Plaintiff complained of symptoms of strep throat and had been taking Tylenol Sinus and Cold. Plaintiff's strep screen was position and she was diagnosed with strep pharyngitis[1].

On January 13, 2003, at approximately 9:20 p.m., plaintiff was seen in the emergency room at St. Mary's Healthcare Center complaining of a backache (Tr. at 115-118, 204-205). She reported that her symptoms had started suddenly a few hours before her arrival. "No previous similar episodes. No other

---

[1]Pharyngitis is an inflammation of the pharynx that frequently results in a sore throat.

complaints at this time." Plaintiff was using only Biaxin
(antibiotic) and a hormone patch at the time. She was tender to
palpation over the right flank.  She was assessed with right
flank pain.  Plaintiff was given 30 mg of Toradol (non-steroidal
anti-inflammatory) through an IV and her symptoms improved.
Frank Divincenzo, M.D., noted that plaintiff's symptoms
clinically suggest a kidney stone, and she was discharged with
kidney stone instructions, Toradol, and Vicodin as needed for
severe pain.

On Thursday, January 16, 2003, at 10:00 a.m., plaintiff was
seen by Dr. Baskett (Tr. at 99).  She said she had gone to the ER
the previous Monday and was told she had a kidney stone.
Plaintiff was told to follow up with her doctor, which she was
doing on this visit, and reported no pain.

On January 20, 2003, at approximately 9:00 a.m., plaintiff
saw Dr. Baskett for a follow up urine test (Tr. at 100).

On February 13, 2003, at approximately 4:00 p.m., plaintiff
saw Dr. Baskett (Tr. at 101).  Plaintiff said she has
fibromyalgia and Tylenol PM "isn't touching her pain anymore".
Plaintiff reported pain in her upper legs, headaches, chest pain,
and sleeping problems.  "Can either sleep for 3 days or can't
sleep for 3 days."  She rated her pain a 4 out of 10.  Dr.
Baskett performed a physical exam and found tender areas in

9

plaintiff's thighs and back. He assessed fibromyalgia and chronic pain. He prescribed Effexor (antidepressant), Xanax (treats anxiety), and Vicodin (narcotic analgesic).

On March 17, 2003, at approximately 3:20 p.m., plaintiff saw Dr. Baskett to get a refill on her medication (Tr. at 102). Plaintiff rated her pain a 2 out of 10, and said she received relief when she took Vicodin at bedtime and Advil during the day. Dr. Baskett refilled plaintiff's Effexor and Vicodin and told her to discontinue the Xanax.

On April 11, 2003, at approximately 8:10 a.m., plaintiff saw Dr. Baskett complaining of a sore throat (Tr. at 103). She rated her pain a 6 and said she had been taking Tylenol Cold for relief. Plaintiff said she was very fatigued in the afternoons and did not think the Effexor was helping her fibromyalgia. Dr. Baskett assessed pharyngitis and fibromyalgia. He prescribed a z-pak (Zithromax, an antibiotic) and Lexapro (treats depression), and told plaintiff to discontinue the Effexor.

On April 14, 2003, at approximately 10:10 a.m., plaintiff saw Dr. Baskett for a follow up on her sore throat (Tr. at 104). Plaintiff's strep screen was positive. The medication prescribed by Dr. Baskett is illegible.

On May 12, 2003, at approximately 4:20 p.m., plaintiff saw Dr. Baskett complaining of pain and dizziness for the past three

10

days (Tr. at 105).  Plaintiff's exam was normal.  Dr. Baskett assessed vertigo and fibromyalgia.  He ordered lab work and refilled plaintiff's Vicodin and Lexapro.

On May 16, 2003, at approximately 9:20 a.m., plaintiff had blood drawn at Dr. Baskett's office (Tr. at 106).

On June 24, 2003, plaintiff saw Dr. Baskett (Tr. at 107). She stated that the Lexapro was not working, and she stopped taking that medication due to dizziness and stomach ache. Plaintiff said that she would like a physical at Mayo. Plaintiff's physical exam was normal.  She was diagnosed with fibromyalgia.  Dr. Baskett told plaintiff to discontinue Lexapro and prescribed Remeron (antidepressant).  He also referred plaintiff to a rheumatologist.

On August 28, 2003, plaintiff saw someone at Dr. Baskett's office (Tr. at 109).  She complained of lots of pain from fibromyalgia and said Hydrocodone helps some.  She was assessed with fibromyalgia.  Plaintiff had a rheumatology appointment scheduled for September 10, 2003, and said she was off work for the summer until September 11, 2003.  Plaintiff was continued on her same medication.

On September 10, 2003, plaintiff was seen by Daniel Jackson, M.D., a rheumatologist (Tr. at 121-123).  Plaintiff denied waking up due to pain, but said she sometimes sleeps 15 hours a night,

and other times she sleeps for two to three hours a night.
Plaintiff had tender points in 13 of 18 areas.  There was no sign
of synovitis[2] in her hands, wrists, elbows, knees, or ankles.
She had good range of motion in her shoulders.  Plaintiff was
assessed with fibromyalgia.  Dr. Jackson recommended a low dose
tricyclic antidepressant and he gave her a month's supply.  He
said if that did not help, he would recommend physical therapy
with possible warm water hydrotherapy.  He also suggested
replacing her Vicodin with a low dose non-steroidal anti-
inflammatory of Ultram (non-narcotic pain reliever) for pain.

On February 6, 2004, plaintiff canceled her appointment at
St. Mary's (Tr. at 111).

On March 29, 2004, plaintiff canceled her appointment at St.
Mary's (Tr. at 112).

On Tuesday, March 30, 2004, plaintiff was seen at St. Mary's
(Tr. at 113).  She stated that the previous Sunday (the day
before her last canceled appointment), she has an "attack" where
she could not breathe and her heart was racing.  The attack
lasted about 45 minutes.  Plaintiff was assessed with
palpitations and elevated blood pressure (her blood pressure on
this visit was 138/98).  The doctor recommended plaintiff wear a

_____

[2]Synovitis is the inflammation of a synovial (joint-lining)
membrane, usually painful, particularly on motion, and
characterized by swelling, due to effusion (fluid collection) in
a synovial sac.

12

24-hour Holter monitor.  She wanted to know how much it would cost, and then said she would get back with the doctor.

On May 13, 2004, plaintiff saw Brenda Woods, D.O., a rehabilitation specialist, at the request of Disability Determinations (Tr. at 125-130).  Plaintiff reported that her pain wakes her up at night.  She reported that her pain was worse with walking, sitting, standing, lying on her back with her knees flexed, lying on her stomach, lifting, carrying, vacuuming, rising from a soft chair, riding in a car, or reading.  Her pain is not affected by lying flat on her back, lying on her side, sneezing, taking a deep breath, or brushing her teeth.  Plaintiff had normal range of motion in her shoulders, elbows, wrists, knees, hips, lumbar spine.  She had negative straight leg raising.  She had multiple tender points, some muscle tenderness, and some muscle spasms in her low back. No evidence of muscle atrophy.  Dr. Woods observed that plaintiff was able to get on and off the exam table, she was able to dress herself without difficulty, she was pleasant and cooperative.  Dr. Woods diagnosed fibromyalgia, probable chronic fatigue syndrome, and depression.  "This individual's functional activities are limited by her complaints of pain and fatigue.  She does demonstrate weakness but that does not seem to be her major limiting factor. She is able to hear and speak without difficulty.  Her fatigue

13

apparently limits her ability to concentrate and perform as well as drive long distances."

On June 4, 2004, Janet Elliot, M.D., completed a Physical Residual Functional Capacity Assessment (Tr. at 131-138). She found that plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, stand or walk for six hours per day, sit for a total of six hours per day, and had an unlimited ability to push or pull. In support of her findings, she cited the rheumatologist's report wherein plaintiff was found to have no muscle weakness or abnormal physical findings, and Dr. Woods' report which states that main problem is pain and need for sleep. "Dr. Jackson suggested sleep study if systems persisted. No report that this has been performed." Dr. Elliot found that plaintiff had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations. In summary, Dr. Elliot wrote, "Claimant complains of chronic pain and sleep difficulties. Her current medications are Prozac 20 mg qd [daily], Amitriptyline 25 mg qd [daily], and Ultracet prn [as needed]. Physically no abnormalities noted in exams of physicians. Her complaints of pain are consistent with fibromyalgia however her sleep issues appear to be the disrupting factor. Though significant for the claimant these issues should not interfere with her ability to

14

sustain SGA [substantial gainful activity] and can be further addressed by her physician."

On July 18, 2004, plaintiff was seen by Kristin Tate, M.D., in the emergency room at St. Mary's Health Center (Tr. at 185-196). Portions of the record read as follows:

HISTORY OF PRESENT ILLNESS:
The patient is a very pleasant 36-year-old who presents to the emergency room today with complaints of chest pain. This female states that last night she got in an argument with her son. Just this past week her mother died. She states that last night immediately after getting in the fight with her son she began having substernal to left-sided chest pain. A mild amount of radiation to her left scapula but otherwise no radiation. No shortness of breath. A little nauseated last night but none today. No palpitations, orthopnea[3], PND[4], peripheral edema[5], syncope[6] or presyncope[7]. The pain, when it comes, lasts about 30 seconds and she gets one or so an hour. She has no other complaints at this time. . . . No lower extremity swelling or pain. . . . She denies any other complaints at this time. . . .

PAST MEDICAL HISTORY:
1. Mild depression.
2. Fibromyalgia.

CURRENT MEDICATIONS
Prozac but stopped taking about a week ago because she "ran out." She was taking 10 mg a day.

---

[3]The inability to breathe easily unless one is sitting up straight or standing erect.

[4]Paroxysmal Nocturnal Dyspnea, a breathing disorder caused by lying flat.

[5]Swelling of the feet, ankles, or legs.

[6]Fainting.

[7]Lightheadedness.

* * * * *

REVIEW OF SYMPTOMS
. . .  Denies any history of . . . migraine headache.

PHYSICAL EXAMINATION
General:  Cooperative, in no distress.  Answers questions appropriately.  Appears very reliable.  Awake, alert and oriented x 3. . . .
Neck:  Supple.  Full range of motion.  Fully nontender. . . .
Chest Wall:  . . .  Fully nontender.

Plaintiff was given IV Ativan[8] with full resolution of pain. Her chest CT was normal.  Plaintiff was assessed with atypical chest pain.

PLAN
At this time the patient is much improved.  There is definitely an anxiety component to this.  Her only risk factor is her family history which is a significant risk factor.  I spoke with the patient about options.  She prefers to be discharged home at this time and have outpatient dual-isotope stress test performed.  We will have this performed on Monday or Tuesday of next week.  It is essential that it is done early.  She should push fluids and rest.  I have given her some Xanax 0.25 mg to take every 8 hours as needed for anxiety symptoms.  I want her to phone Dr. Baskett and plan to follow up with him later next week after the stress test.  If any further chest pain I want her to return to the ER immediately.  The CT scan of her chest that was performed showed no evidence of pulmonary embolus as above.

On September 17, 2004, plaintiff was seen at St. Mary's Health Center complaining of a sore throat (Tr. at 175).  She was assessed with pharyngitis and was given Zithromax (antibiotic), Ibuprofen (over-the-counter strength) as needed for pain, and

---

[8]Treats anxiety, insomnia, and seizures.

16

Ultracet as needed for pain.

On November 6, 2004, at about 11:30 p.m., plaintiff was seen in the emergency room at St. Mary's Health Center complaining of abdominal pain (Tr. at 178-184). Plaintiff had a CT scan of her kidneys and bladder, which were normal. The medical report reads in part as follows:

> HISTORY OF PRESENT ILLNESS:
> . . . She states that she has been feeling poorly for several days and that she was complaining to her husband tonight and he thus insisted that she be evaluated. She states that she is actually feeling better today than was last night. One complaint is a headache that she has had for the past month. This headache is sometimes in the left frontal, sometimes in the right frontal or temporal area. It tends to last for 15 minutes to an hour. It is a sharp pain. There are no associated symptoms with it. . . .
>
> . . . She reports that her discomfort tonight is no worse than usual but that her husband had encouraged her to come here for evaluation since she kept complaining.

Plaintiff was taking Ultracet. She said she lives with her husband and is a "homemaker". On exam, plaintiff reported no increase in muscle or joint pain, no chest pain or palpitations. Plaintiff was observed to be in no acute distress. "She looks perfectly comfortable." Plaintiff had some back tenderness, normal extremities. She had a complete blood count, a basic metabolic panel, and a renal CT scan, all of which were normal. She was diagnosed with left flank pain, probably musculoskeletal in etiology; and headache. Plaintiff was told to follow up with her primary care physical. Upon discharge, plaintiff said her

17

Ultracet was inadequate, so she was prescribed Darvocet (narcotic analgesic).

On November 9, 2004, plaintiff had lab work done (Tr. at 172). The results showed that plaintiff had high cholesterol and high LDL cholesterol.

On November 10, 2004, plaintiff had an MRI of her brain due to her history of headaches (Tr. at 171, 176-177). The MRI was negative.

On November 19, 2004, plaintiff was seen at St. Mary's Health Center (Tr. at 174). She reported that she had been seen in the emergency room due to blood in her urine. She complained of headache, sore throat, and joint pain. She was assessed with chronic headaches, pharyngitis, fibromyalgia, depression, fatigue, and hematuria (blood in the urine). The doctor ordered lab work.

On March 14, 2005, plaintiff was seen at St. Mary's Health Center due to a sore throat (Tr. at 170). She was assessed with acute pharyngitis.

On July 13, 2005, plaintiff saw Richard Kimball, M.D., at St. Mary's Eldon Family Health Center (Tr. at 139-140, 167-169). She was there for a refill of the medication that had been prescribed by Dr. Baskett. "Ultracet samples she has on hand do still help." Plaintiff described her pain as a four out of ten,

18

and she said her pain does respond to prescription medicine treatment partially.  Dr. Kimball assessed fibromyalgia, depression, abnormal weight gain, and anemia.  He told plaintiff to start taking St. John's Wort, iron supplements, a multivitamin, and magnesium supplements, and he directed her to have lab work done.

That same day, plaintiff cancelled her appointment for lab work at Diagnostics Inc. (Tr. at 164).

On October 30, 2005, plaintiff was seen at St. Mary's Health Center complaining of a swollen/tender area behind her left ear that was preventing her from sleeping (Tr. at 166).  Plaintiff had an abscess on her scalp.  She was prescribed Keflex (antibiotic) and Trazodone (antidepressant).

## C.   *SUMMARY OF TESTIMONY*

During the August 10, 2005, hearing, plaintiff testified as follows:

At the time of the hearing, plaintiff was living with her husband and her children, who were 19 and 10 (Tr. at 221).  She was born in 1968 and was 37 years of age (she is currently 38) (Tr. at 221).  Plaintiff has a high school education (Tr. at 231).

Plaintiff was diagnosed with fibromyalgia in 2002 by Dr. Baskett at St. Mary's Clinic in Eldon (Tr. at 222).  Plaintiff's

19

current doctor is Dr. Kimball, because Dr. Baskett left the Eldon clinic (Tr. at 222). Plaintiff agreed that the latest report from St. Mary's Clinic had been submitted to the ALJ (Tr. at 222). Plaintiff said she had gall bladder surgery in the summer of 2005, but she did not provide those records (Tr. at 222).

Plaintiff contracted mono in 1996 after giving birth to her daughter (Tr. at 223). She did not know for quite a while that she had it, and it took her a while to get over it (Tr. at 223). Since then she has not been the same as far as fatigue (Tr. at 223). It was not that bad at first, but it has gotten worse over the years (Tr. at 223).

Plaintiff's last employment was as a teacher's aide with the Eldon school district (Tr. at 223). Before that she was an office manager for about a year at Lake Ozark Retirement Center (Tr. at 223). Plaintiff left that job because she had a lot of pain with sitting all day, she could not get up even for five minutes a day, and she had a lot of stress (Tr. at 224). She left that job to take a job at the school with fewer hours (Tr. at 224). Although she had to take a big cut in pay, she felt it was a way for her to cope with her problems (Tr. at 225).

As a teacher's aide, plaintiff worked one-on-one with a little girl (Tr. at 225). She went to the classroom with her and helped her with things like reading and enlarging the papers to

help the girl do things (Tr. at 225). Plaintiff had to walk from classroom to classroom, and she "did our own little special P.E. thing every day" (Tr. at 226). Plaintiff worked at the school district for two years (Tr. at 226).

At first plaintiff was doing OK at work, but after a while she began needing to go to the nurse's office to lie down during the day, sometimes two or three times per day (Tr. at 226). She had to lie down due to dizziness and fatigue (Tr. at 226). After her last summer break, plaintiff went to school for three days (the school was on half days at the time due to the heat) (Tr. at 226). On the fourth day, she called in sick and her doctor put her on medical leave (Tr. at 226). She has not been employed since that time, which was August 2003 (Tr. at 226, 227). Plaintiff's alleged onset date is January 2003, which is when she needed to start taking naps in the nurse's office, not when she actually stopped working (Tr. at 227-228).

Plaintiff's fatigue causes her to lie down nearly every day (Tr. at 227). She needs to lie down at least a few times a day, normally three times (Tr. at 227, 230). When a doctor prescribes medicine, it usually works for two weeks to two months, but then it stops working (Tr. at 228). At the time of the hearing, plaintiff was taking amitriptyline in a low dose for fibromyalgia, iron supplements for anemia, St. John's Wort, and

21

magnesium (Tr. at 229). Plaintiff is doing everything her doctor suggested (Tr. at 229). Some people suggested she try getting a weekly massage, but she cannot afford to do that (Tr. at 229).

For the past two and a half weeks prior to the hearing, plaintiff was having difficulty sleeping (Tr. at 230). Her sleeping goes in cycles, where she will hardly sleep at all for a while, then it will hit her and she will sleep three or four days, 24 hours a day (Tr. at 230-231). Plaintiff has tried Tylenol PM and Unisom but nothing works (Tr. at 231).

Plaintiff has migraines and sometimes gets swelling in her ankles and hands (Tr. at 232). The swelling can result from just going to the grocery store (Tr. at 232).

Plaintiff believes she cannot work due to the fatigue, and because she would need to be off work for four days because of her sleeping cycle (Tr. at 231). About a year ago, plaintiff decided to volunteer at the school, but she had to go home by around 11:00 after starting at 9:30 (Tr. at 232). Plaintiff had been setting up tables with plates and things, getting ready for a grandparents' picnic (Tr. at 232). When she went home at 11:00, she immediately went to bed and went to sleep (Tr. at 232).

Plaintiff's 19-year-old son takes care of himself, and when she is in one of her three- or four-day sleeping cycles,

plaintiff's son or husband takes care of her ten-year-old daughter (Tr. at 233). They also help with the laundry (Tr. at 233). Plaintiff can sweep but she cannot vacuum (Tr. at 233). She makes a list of things that need to be done, and she does about two things a day (Tr. at 233). Her husband and kids help out with what she cannot do (Tr. at 233). When plaintiff is fatigued, she has trouble remembering things (Tr. at 234). Plaintiff drives just a little (Tr. at 234).

Plaintiff was asked whether she experiences depression, and she said, "Sometimes I feel like I am. I mean, you know, I'm kind of housebound. I'm not around people. I would much rather, you know, be working at the school where I can be around people and you know, have a life." (Tr. at 235).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Thomas Muldoon entered his opinion on September 1, 2005 (Tr. at 15-22). The ALJ found that plaintiff's insured status for purposes of Title II disability expired on September 30, 2004 (Tr. at 16-17).

At step one, the ALJ found that plaintiff continued to work steadily as a teacher's aide for about 37.5 hours per week through May 2003, earning $865 each month from January through May 2003, which is over the minimum substantial gainful activity amount for that year (Tr. at 17). He noted that plaintiff

23

claimed to have missed a lot of work due to illness during that time, and after the summer recess she attempted to return to the school in August 2003 but earned only about $100 that month and did not work after August 27, 2003 (Tr. at 17). "It would appear from this evidence that the claimant continued to perform substantial gainful activity through at least May 2003. There is no credible or confirming evidence that her work after 2002 was subsidized in any way, or that she did not earn her pay after that. Regardless, the medical evidence in this case does not justify a finding of disability." (Tr. at 17).

From the ALJ's statements, it appears plaintiff was found not disabled at the first step of the sequential analysis, although the ALJ continued the analysis through the fifth step.

At the second step of the sequential analysis, the ALJ never did identify any impairment he found to be severe. He did, however, find that plaintiff has no impairment or combination of impairments that meets or equals in severity the requirements of a listed impairment (Tr. at 18).

The ALJ evaluated the medical evidence and plaintiff's credibility, and then found that plaintiff has the residual functional capacity to perform a full range of at least light work (Tr. at 19). Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects

Case 2:06-cv-04181-REL   Document 19   Filed 03/13/07   Page 24 of 39

weighing up to ten pounds.  The ALJ then found that plaintiff's
"past relevant jobs, as she described and performed them, did not
require the performance of work activities precluded by these
limitations.  At least some of these jobs, including the two
recent ones as an office manager and teacher's aide and the
earlier one as a bank teller, were performed for substantial
earnings within the last 15 years, and are therefore still
vocationally relevant." (Tr. at 19).  Therefore, the ALJ found
alternatively at step four of the sequential analysis that
plaintiff is not disabled.

Finally, the ALJ made another alternative finding at step
five of the sequential analysis:  "Even if the undersigned were
to extend a significant benefit of the doubt to the claimant and
find her restricted to sedentary work because of chronic
exertional pain and/or fatigue, and to simple, repetitive tasks
because of depression, she would be not disabled.  At all
relevant times the claimant has been a 'younger individual'
according to the regulations.  She is a high school graduate.
When these vocational factors are combined with a residual
functional capacity for at least sedentary work, 20 CFR 404.1569
and 416.969 and Rules 201.28-201.29 in Table No. 1 of Appendix 2,
Subpart P, Regulations No. 4 direct a conclusion of 'not
disabled,' irrespective of whether or not the claimant has

transferable job skills.  The restriction to simple, repetitive tasks would not preclude the application of the above Rules to find the claimant not disabled.  Social Security Ruling 85-15." (Tr. at 21).

## VI.  *PLAINTIFF'S BRIEF*

Plaintiff, pro se, submitted a one-page memorandum[9] to me rather than the typical Social Security brief.  Plaintiff's memorandum reads as follows:

> On September 1, 2005, I was denied Social Security Disability Benefits by Judge Thomas Muldoon.  I filed for an appeal.  My request for review of the judge's decision was denied on June 14, 2006.  I am now asking for a court review of the judge's decision.
>
> The judge felt that I should be able to go back to my previous employment.  Even if I was able to, physically, I could not legally.  Since the time that I left my position as a teacher's aide, due to my condition, the No Child Left Behind Act has been implemented.  I do not have the 60 hours of college credit, now required, to go back to my previous job.  Therefore, there should have been an evaluation by a vocational expert.
>
> There is an obvious lapse in my medical records, although I signed for them twice at each medical facility.  I don't know if the lapse was due to a lack of record keeping by the physician or because of preparation by my attorney.
>
> The judge's denial states that he "infers that the claimant did not get medical treatment more often because she did not feel a medical need for it."  I did go to the doctor numerous times and was sent to two different specialists.

---

[9]I point out here that the defendant, in his response, states, "Defendant does not contest the statement of facts contained in Plaintiff's brief."  However, there was no statement of facts contained in anything submitted by plaintiff.

After being diagnosed with fibromyalgia by three physicians
I was told that there is nothing they can do for it.
Therefore, the need to go to the physician was only to get
prescriptions changed or refilled. I tried a variety of
different medicines, so far nothing has helped. If I went
to my physician every time I felt a "medical need for it" I
would be there every day. Obviously, that is not possible.

I believe that I was inadequately represented by my
attorney. I gave her information that she did not submit.
I realize that this is not the fault of the judge or the
appeals council but I feel that I should not be denied a
review because of inadequate representation.

I am asking for a review because I am physically unable to
work and live a normal life. I don't know of anyone who
would hire an employee that would have to take naps
throughout the day and call in sick 3 or 4 days a week. I
would love to be able to have a job, go shopping and do the
things a healthy person does. Hopefully with more research
being done about fibromyalgia I will be able to someday, but
right now that is just not possible.

## A.  *CREDIBILITY OF PLAINTIFF*

The credibility of a plaintiff's subjective testimony is
primarily for the Commissioner to decide, not the courts. Rautio
v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen,
830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies
in the record as a whole, the ALJ may discount subjective
complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999);
McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ,
however, must make express credibility determinations and set
forth the inconsistencies which led to his or her conclusions.
Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v.
Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ

Case 2:06-cv-04181-REL   Document 19   Filed 03/13/07   Page 27 of 39

explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

The claimant had a scattered and somewhat erratic work record, with fair to very good earnings in some years but little or no earnings in others. . . .

. . . The claimant was under the outpatient care of Gary N. Baskett, D.O., beginning January 10, 2003, when he treated

28

her for strep pharyngitis. She had emergency room attention on January 13 for a kidney stone, and had another episode of pharyngitis in April 2003. On March 30, 2004, the claimant had chest palpitations, and her blood pressure was slightly elevated at 138/98 that day, but none of these were persistent problems, and none resulted in any long-term limitations or complications. There is no documented evidence of migraine headaches, and if the claimant had gallbladder surgery in the summer of 2005, as she testified, that apparently was not a long-term problem either.

The claimant saw Dr. Baskett about once a month, sometimes more often, between about January 2003 and September 2003. She started alleging chronic pain related to probable fibromyalgia on February 13, 2003, and Dr. Baskett prescribed three different medications. He refilled her medications on March 17, and the claimant said at that time that her degree of pain was only 2 on a scale of 0-10. She first alleged dizziness, along with continuing joint pain, on May 12. . . . On September 30, 2003, the claimant alleged bilateral leg pain to Dr. Baskett, but then did not see him again until March 30, 2004 after canceling appointments for February 26 and March 29, 2004. She was seen for the palpitations on March 30, and apparently did not see Dr. Baskett again after that date.

. . . Dr. Woods diagnosed fibromyalgia, depression and possible chronic fatigue syndrome, but said that the claimant would be functionally limited primary [sic] by her complaints of pain and fatigue.

* * * * *

No doctor who has treated or examined the claimant, including Dr. Baskett or Dr. Kimball, has stated or implied that she is disabled or totally incapacitated. No such doctor has placed any specific long-term limitations on the claimant's abilities to stand, sit, walk, bend, lift, carry, or do other basic exertional activities. The claimant has never had regular medical attention or treatment, at least not since September 2003. There is no evidence that she has ever been refused medical treatment because of inability to pay. The undersigned infers that the claimant did not get medical treatment more often because she did not feel a medical need for it.

Although the claimant told Dr. Woods and Dr. Kimball that she had had fibromyalgia for years, complaints of musculoskeletal [pain] do not appear in the medical records from Dr. Baskett until February 2003. None of the doctors who saw the claimant suggested that she remain idle instead of active. There is no clear diagnosis, or medical evidence supporting, any diagnosis of chronic fatigue syndrome, or any other impairment that would account for allegations of severe fatigue and freqnent [sic] headaches or dizziness. The diagnosis of anemia appears to be a self-diagnosis by the claimant. There is no documented evidence of frequent joint swelling. All of the other physical problems mentioned by Dr. Baskett were minor or acute illnesses or injuries resulting in no significant long-term limitations or complications.

The claimant has had no surgery or inpatient hospitaliza-tions, at least not in recent years. She has not been referred for physical therapy or to any pain clinic or pain disorders specialist for treatment. She does not take strong doses of any pain medication, and there is no documented record or allegation of any adverse side effects from medications the claimant does take. Whatever adverse side effects the claimant may have had at various times were presumably in all instances eliminated or at least greatly diminished by simple changes in either the type of medication or the size and/or frequencies of the dosages.

The claimant does not have most of the signs typically associated with chronic, severe musculoskeletal pain such as muscle atrophy, persistent or frequently recurring muscle spasms, neurological deficits (motor, sensory, or reflex loss) or other signs of nerve root impingement, significantly abnormal x-ray or other diagnostic tests, positive straight leg raising, inflammatory signs (heat, redness, swelling, etc.), or bowel or bladder dysfunction. The medical evidence establishes no inability to ambulate effectively or to perform fine and gross movements effectively on a sustained basis due to any underlying musculoskeletal impairment.

To the extent that the claimant's daily activities are restricted, they are restricted by her choice and not by any apparent medical proscription. There is no documented evidence of nonexertional pain seriously interfering with or diminishing the claimant's ability to concentrate. No other

30

lay witness has produced any evidence to corroborate the
claimant's allegation of disability.

* * * * *

The claimant's allegation of impairments, either singly or
in combination, producing symptoms and limitations of
sufficient severity to prevent the performance of all
sustained work activity is not credible. . . .

## 1. PRIOR WORK RECORD

The ALJ noted that plaintiff had "a scattered and somewhat

erratic work record, with fair to very good earnings in some

years but little or no earnings in others." Plaintiff had only

four years in her life when she earned more than $10,000 per

year. During the years when plaintiff did earn income, her

average annual earnings is $6,367.55. Finally, plaintiff told

the emergency room doctor at St. Mary's in November 2004 that she

is a homemaker, not that she was unable to work due to a

disability. This factor supports the ALJ's credibility

determination.

## 2. DAILY ACTIVITIES

Plaintiff reported in her Claimant Questionnaire that she is

able to do laundry, do dishes, make her bed, change sheets, iron,

bank, and go to the post office. She reads, watches television,

and plays board games. She drives to her daughter's school

daily, and she drives to the store once a week. Several times a

year she is able to sit during drives with her family to Branson,

31

Kansas City, or St. Louis.

The ALJ found that to the extent that plaintiff's daily activities are restricted, they are restricted by her choice and not by any apparent medical proscription. The substantial evidence in the record supports this finding.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

On February 13, 2003, plaintiff was taking only Tylenol PM for her fibromyalgia and rated her pain a 4 out of 10 with only that medication.

Dr. Jackson suggested a sleep study if plaintiff's sleep problems persisted; but no sleep study was ever done, indicating that the sleep problems were not as severe as plaintiff alleges.

When plaintiff was seen by Dr. Tate in July 2004 for chest pain after arguing with her son, she stated several times that she had no other complaints. Therefore, her pain and fatigue from fibromyalgia either were not very significant or were being controlled with her medication.

In November 2004, when plaintiff's husband strongly suggested she be seen in the ER due to her complaining, plaintiff was observed to look "perfectly comfortable" and reported no increase in joint or muscle pain. She was only taking Ultracet at the time.

32

Plaintiff testified that she has migraines; however, she told Dr. Tate she had no history of migraines, and no other medical record even mentions migraines. Plaintiff testified that she gets swelling in her ankles and hands; however, Dr. Tate observed no peripheral edema or swelling, and again, no other medical record includes a complaint or finding of swelling.

This factor supports the ALJ's credibility determination.

**4. *PRECIPITATING AND AGGRAVATING FACTORS***

There is nothing in the record about precipitating or aggravating factors other than plaintiff's own allegations.

**5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

On January 13, 2003, plaintiff went to St. Mary's and was diagnosed with a kidney stone. At the time she was only taking an antibiotic for strep pharyngitis and a hormone patch. She was taking no medication for fibromyalgia, even though this was after her alleged onset of disability.

On February 13, 2003, plaintiff was only taking Tylenol PM for her fibromyalgia, and her pain was rated only a 4 out of 10. This was the first complaint of any fibromyalgia symptoms during the past eight months, despite having been on no prescription medication for this condition. A month later, plaintiff rated her pain a 2 out of 10 with taking a Vicodin at bedtime and Advil during the day. By July 2004, plaintiff was taking only Prozac

33

and was not even taking that regularly.  In July 2005, plaintiff
told Dr. Kimball that the Ultracet was still helping.

Plaintiff told Dr. Folz that she had no side effects from
her Nortriptyline.  There are no problems with side effects
listed in the medical records.

This factor supports the ALJ's credibility finding.

## 6.  *FUNCTIONAL RESTRICTIONS*

There are no functional restrictions in plaintiff's medical
records.  In fact, Dr. Folz advised plaintiff on aerobic
conditioning when she first saw him and was diagnosed with
fibromyalgia.

Dr. Elliott found that plaintiff could occasionally lift 50
pounds, frequently lift 25 pounds, stand or walk for six hours
per day, sit for six hours per day, and had no other limitations
at all.  The ALJ gave plaintiff the benefit of the doubt and
found that she could lift only 20 pounds occasionally and ten
pounds frequently.

## 7.  *CREDIBILITY CONCLUSION*

In addition to the above Polaski factors, I also note a few
other things relevant to plaintiff's credibility.  Although
plaintiff reported that she missed a lot of work from January
2003 through May 2003 and had to spend hours each day lying down
in the nurse's office, her Work Activity Report gave her the

34

option of checking the box which states, "I worked irregular hours or took frequent rest periods" and she did not. Instead, the only work accommodation she listed was that she was assigned a girl in a wheelchair who had to be diapered, and on her request she was switched to a student who would not need that kind of assistance.

In September 2003 plaintiff told her rheumatologist that she did not wake up due to pain, but when she saw Dr. Woods at the request of Disability Determinations, she claimed that her pain wakes her up at night.

Also, as pointed out by the ALJ, plaintiff did not often see her doctor for fibromyalgia. Plaintiff saw her doctor on September 10, 2003, but did not see a treating physician again until March 30, 2004, and that was due to a racing heart, not due to fibromyalgia. This was not the obvious lapse in medical records to which plaintiff refers in her brief, as there are records that plaintiff had appointments with her treating physician during that time but called to cancel them. Plaintiff saw only a doctor at the request of Disability Determinations until July 18, 2004, when she went to the emergency room for chest pain after having argued with her son. Her symptoms were relieved with Ativan, an anxiety medication. Plaintiff went to St. Mary's for a sore throat only on September 17, 2004, and then

35

went to the ER in November 2004 after her husband insisted she go due to her complaining. During that ER visit, however, she told the doctor that her pain was in her abdomen, and it was no worse than usual. The records clearly support the ALJ's finding that plaintiff was not treated often for her allegedly disabling impairment.

Based on the above discussion, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's subjective allegations of pain and fatigue are not entirely credible.

**B.    *LAPSE IN MEDICAL RECORDS***

Plaintiff argues that there is an "obvious lapse" in medical records although she signed for her records twice. Plaintiff fails to indicate where the lapse is or for which doctors. Plaintiff's alleged onset date is January 1, 2003. The medical records before me include medical records for each month of January except July, November and December; for each month of 2004 except January, April, August, and December; and for March, July, and October of 2005. Although I see infrequent doctor visits, i.e., monthly or sometimes a less often (as pointed out by the ALJ), I see no "obvious lapse" of medical records.

Because plaintiff has failed to identify what medical records are missing, and has failed to obtain those records and

36

provide them herself, her motion for summary judgment on this basis will be denied.

## C. PLAINTIFF'S PAST RELEVANT WORK

Plaintiff argues that she cannot legally perform her past relevant work as a teacher's aide because the law has changed and she does not have the educational requirements for that job. This does not address the fact that plaintiff originally was found not disabled at the first step of the sequential analysis due to her substantial gainful activity after her alleged onset date. In any event, even if plaintiff is correct that she can no longer work as a teacher's aide due to the No Child Left Behind Act which requires college education that plaintiff does not have, the result of her disability application would be the same. The ALJ found at step four of the sequential analysis that plaintiff could perform the full range of light work and therefore could return to her past relevant work as a teacher's aide or as an office manager. Plaintiff's inability to work as a teacher's aide because of the new law does not affect her ability to work as an office manager. Therefore, the ALJ's finding that plaintiff could return to her past relevant work as an office manager precludes a finding of disability.

In addition, the ALJ found alternatively at step five of the sequential analysis that plaintiff could perform other work in

Case 2:06-cv-04181-REL   Document 19   Filed 03/13/07   Page 37 of 39

the economy: "[Plaintiff is] a 'younger individual' according to the regulations. She is a high school graduate. When these vocational factors are combined with a residual functional capacity for at least sedentary work, 20 CFR 404.1569 and 416.969 and Rules 201.28-201.29 in Table No. 1 of Appendix 2, Subpart P, Regulations No. 4 direct a conclusion of 'not disabled,' irrespective of whether or not the claimant has transferable job skills. The restriction to simple, repetitive tasks would not preclude the application of the above Rules to find the claimant not disabled. Social Security Ruling 85-15."

Therefore, the alternative finding of the ALJ, even with a more restrictive residual functional capacity, precludes an award of disability benefits on the ground that plaintiff cannot legally perform the job of teacher's aide.

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's findings that (1) plaintiff did perform substantial gainful activity after her alleged onset date, (2) plaintiff retains the residual functional capacity to return to her past relevant work, (3) plaintiff retains the residual functional capacity to perform other work available in the economy, and (4) plaintiff is not disabled. Therefore, it is

38

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 12, 2007